# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DUSTIN GORDON,

               Petitioner,

v.                                     Case No. 2:05-CV-70360-DT

KEN MCKEE,

               Respondent.

_____/

## OPINION AND ORDER DENYING WRIT OF HABEAS CORPUS

Petitioner Dustin Gordon has filed a *pro se* application for the writ of habeas corpus under 28 U.S.C. § 2254. The habeas petition challenges Petitioner's state convictions for second-degree murder and possession of a firearm during the commission of a felony (felony firearm). Petitioner's claims do not entitle him to the writ of habeas corpus. Therefore, his habeas petition will be denied.

## I. BACKGROUND

Petitioner initially was charged in Wayne County, Michigan with open murder, which includes first- and second-degree murder, and felony firearm. Before trial, the prosecutor dismissed the open murder charge and amended the information to charge Petitioner with second-degree murder and felony firearm. The charges arose from allegations that Petitioner shot and killed his twelve-year-old sister, Crystal Gordon. His defense was that the shooting was accidental. On May 15, 2001, the jury found Petitioner guilty of second-degree murder, Mich. Comp. Laws § 750.317, and felony firearm, Mich. Comp. Laws § 750.227b. Petitioner moved for a new trial on the basis of

prosecutorial misconduct.  The trial court denied the motion and then sentenced

Petitioner to two years in prison for the felony firearm conviction and to a consecutive

term of twenty-five to forty-five years for the murder conviction.

Petitioner raised his habeas claims in an appeal of right.  The Michigan Court of

Appeals affirmed his convictions, *see People v. Gordon*, No. 236355 (Mich. Ct. App.

June 17, 2003), and on January 27, 2004, the Michigan Supreme Court denied leave to

appeal, *see People v. Gordon*, 469 Mich. 998; 675 N.W.2d 592 (2004) (table).

Petitioner filed his habeas corpus petition on January 31, 2005.  His arguments

read:

I.     Petitioner's Fifth and Fourteenth Amendments were violated
       when the petitioner was denied a fair trial and due process of
       the law by introduction and argument of unfairly prejudicial
       evidence of uncharged criminal conduct and prior bad acts.

II.    Petitioner's Fifth and Fourteenth Amendments under the
       United States Constitution were violated when there was
       insufficient evidence to support a conviction of second
       degree murder.

III.   Petitioner's Fifth and Fourteenth Amendment rights under
       the United States Constitution were violated when the
       prosecutor spoiled the petitioner's right to a fair trial and due
       process by (A) failing to correct false testimony (B) failing to
       give notice on certain bad acts evidence (C) withholding
       evidence (D) making comments in summation about the
       petitioner's trial silence and shifting the burden of proof.

IV.    Petitioner's Sixth and Fourteenth Amendment rights under
       the United States Constitution were violated when the
       petitioner was denied a fair trial and his constitutional right to
       confront his accuser and present a defense was violated
       where the court limited cross examination.

V.     Petitioner's Fifth and Fourteenth Amendment rights under
       the United States Constitution were violated when the

2

cumulative effect of the constitutional errors cited herein
denied due process.

Respondent urges the court in a responsive pleading to deny the habeas petition.

## II.  STATEMENT OF FACTS

John Gordon testified that, on August 15, 2000, he was living with his twelve-year-old daughter, Crystal Gordon, and Petitioner, who was his adopted son.  According to Mr. Gordon, Petitioner was upset because he had lost his job that day and he thought it was unfair that he was not paid for the hours he worked.  Petitioner nevertheless seemed to be looking forward to going on a family vacation the next day and to getting his driver's license.

About 9:30 p.m. that night, Mr. Gordon said good night to Crystal, who was in her room on the second floor of their home and to Petitioner, who was on the landing going up to the third floor where his bedroom was located.  Then he checked the doors of the house to make sure they were locked and retired to his bedroom on the first floor of the house.  At about 10:20 p.m., he heard a fairly loud thump from above him and someone running on the second floor.  Someone ran down the stairs, and the front door opened as if someone were leaving.  He shouted Petitioner's name, but got no response.  A few minutes later, he saw Petitioner, who said that Crystal had been shot and that they should call the 911 operator.  While Petitioner went to the kitchen and called 911, Mr. Gordon proceeded upstairs.  He saw Crystal lying in the doorway of Petitioner's bedroom on the third floor.  She had a severe head wound.  Petitioner joined him upstairs and said something like, "Not my sister."  Both of them were upset and crying. The police arrived and escorted them out of the house.

3

Mr. Gordon further testified that Petitioner and Crystal seemed to get along and had a pretty normal brother/sister relationship.  They cared about each other despite some roughhousing that seemed to be a little more than it should have been at times and some verbal and physical abuse.  Mr. Gordon never saw a gun in the house and he was not aware that his son had a gun.  Mr. Gordon identified Petitioner's voice in a 911 tape, which was played for the jury.  During the tape, Petitioner said, "Someone just shot my sister."

Police Officer Todd Schrecengost testified that he and another officer were dispatched to 185 East Huron Drive in Belleville about 10:30 p.m. on August 15, 2000. He heard some screaming as he approached the house.  After he entered the house, he saw Petitioner coming down the stairway to the first floor.  Petitioner said, "She is up there. My dad is up there.  She has been shot."  Petitioner led him to the third floor of the house where he observed a female lying on the floor with a gunshot wound to the face.  Mr. Gordon was hysterical and continued to yell over and over, "Oh, my God, Oh, my God. Why? Why?"  The officers escorted Petitioner and Mr. Gordon out of the house.

Schrecengost re-entered the house to look for a weapon.  He did not see one, or notice evidence of a shooting in the bedroom or the adjoining sitting area on the third floor.  Sticking out of a chair in the sitting room was a container that held bullets for a handgun.  After he moved a cushion from the chair, he saw two live, nine millimeter rounds.  He also found a fired bullet.  When he tried to trace the path that the bullet had taken, he noticed an unbroken panel of glass or plexiglass in front of a bullet hole in the wall of the sitting room.  He concluded that the glass panels were moved after the bullet

4

passed through the wall.  Next to the sitting room was the bedroom where the deceased

victim was lying.  He noticed some bed linens against the corner where he expected to

find another bullet hole.  When he pulled the bed sheets away from the wall, he saw a

bullet hole on the inside wall of the bedroom.

He went back outside where he asked Petitioner and Mr. Gordon what

happened.  Petitioner responded that someone in dark clothing ran in the front door, ran

upstairs, shot his sister, and ran back down the same way he came.

Officer Schrecengost subsequently obtained a search warrant and returned to

the house.  In the basement of the house, he found shell casings.  He and his assistants

also found bullets in cardboard boxes, a spent bullet on the floor, damage consistent

with bullet holes in the foundation walls, and powder burns on a plastic bag.  On cross-

examination, Officer Schrecengost stated that the sliding glass door to the kitchen was

unlocked.

Ashley Peters testified that Petitioner was her boyfriend and that she watched a

movie with Petitioner at the Gordon home about 8:00 p.m. on August 15.  Before

Petitioner's mother took her home, she took some dirty sheets off the bed and threw

them in a corner by Petitioner's dirty clothes.

Ms. Peters explained that, on one occasion two or three weeks prior to that night,

she saw Petitioner with a black handgun shooting some cardboard boxes in the

basement of the home.  She admitted that, at Petitioner's preliminary examination, she

testified that she saw Petitioner place a handgun under the cushion of a chair outside

his bedroom on the third floor.  After his arrest, Petitioner called her and said that "it was

an accident."

5

Officer Larry Temple testified that he was instructed to take Petitioner to the police department on August 15, 2000.  On the way there, Petitioner whined and said, "I can't believe he shot her."  Officer Temple asked Petitioner, "Who shot her?"  Petitioner responded, "Jason Russell."  Petitioner also stated that he thought he was going to be killed by Jason Russell.  An audiotape and visual tape revealed that Petitioner was quiet during the time that Officer Temple placed him in the car and walked around the back of the car.

Heather London testified that months before the shooting, she saw Petitioner shooting road signs with a handgun while they were riding in a car.  On another occasion, she and Crystal walked into a room in the Gordon home and saw Petitioner in possession of a gun.  Crystal said that she was afraid Petitioner would hurt himself or someone else or that something would happen.  Crystal did not want the gun to remain in the house.

Officer Joseph Melville was sent to the crime scene on August 16, 2000.  He found a black nine-millimeter Beretta behind the house near the lake.  The safety device was off and the hammer was back, indicating that it had been fired before it was thrown there.

Sergeant Robert Rayer testified as an expert in firearms examination.  He stated that the weapon turned over to him from the crime scene was operational when he received it and that it did not malfunction when he tested it.  He had to deactivate the safety device before firing it; the device never deactivated accidentally.  At least five of the bullets submitted to him were fired from the gun, and several cartridge cases had been ejected from that gun.

6

Corporal Kenneth Voigt was an evidence technician and the officer in charge of the case.  He claimed that there were no bullet holes in the sheets that obscured the bullet hole in the bedroom wall on the third floor.  He observed plexiglass storm window panels covering an area where the bullet exited the wall.  He concluded that the panels could not have been there when the shooting happened.  He also determined that the bullet was fired from inside the bedroom toward the adjoining room and that it traveled through the wall at a downward angle from right to left.

Corporal Voigt was informed on the day after the shooting that a weapon had been found.  The gun was loaded and it was in the cocked position; the safety device was off.  There were multiple fingerprints on the gun, but no identifiable ones.

Rachel Johnson was Crystal Gordon's best friend.  She testified that she had seen Petitioner strike Crystal, pick her up and throw her over a couch, and pull her by her hair.  It was more than roughhousing and sometimes it made Crystal cry.  Petitioner also called Crystal nasty names and when he found out that Crystal had slept with a man, he tried unsuccessfully to throw her down the stairs.  Petitioner did not like Jason Russell who lived across the street, and when Petitioner was informed of something that Jason had said, Petitioner responded, "I got something better than that."  Then he showed Rachel a silver handgun.

Matthew Owens testified that he and Petitioner were friends and that he knew Crystal Gordon through Petitioner.  A few days before the shooting, Crystal told Mr. Owens that Petitioner and a few of his friends had beaten her and punched her dozens of times because she would not listen to Petitioner.  Crystal did not report the incident to the police because Petitioner and his friends had threatened to kill her if she did.

7

A few months before the shooting, Petitioner expressed some jealousy and anger toward Crystal.  Petitioner told Owens that Crystal was spoiled and that she would probably receive a larger inheritance than he would because she was John Gordon's daughter, whereas Petitioner was Gordon's stepson.  Owens once saw Petitioner punch Crystal in the arm.  Another time, Petitioner threw Crystal's radio in the fire.

Although Owens blamed Petitioner for stealing his cell phone, he denied fabricating his testimony based upon the cell phone incident. He also made it clear that it was Petitioner's friends, and not Petitioner, who once pulled a knife on him and threatened to kill him when he told them to stop picking on Crystal.

Kevin Pritchard testified that, a week or two before Crystal was shot, he was visiting Jason Russell, who lived across the street from Petitioner.  When Petitioner came home, Kevin called Petitioner a "fake ass buster."  Petitioner then went in the house, came back out, and flashed a black gun at Kevin.

Kevin's brother, Michael Pritchard, testified about the same incident.  He also testified that Crystal Gordon had said she was afraid of Petitioner and did not want to be around him.  He told Crystal that she could come over any time, and, during the month before her death, Crystal went over to Michael's house every day or every other day.

Ashley Ely testified that she was a friend of Crystal Gordon.  Two or three months before Crystal died, Ashley saw Petitioner pick up Crystal and throw her on the floor.  She also saw Petitioner smack Crystal.  Crystal informed her that Petitioner had said he was going to kill her, and Ashley once heard Petitioner say that he was going to kill Crystal.   When Ashley encouraged Crystal to inform the police, Crystal said that she

8

would not go to the police because she loved her brother too much. Petitioner admitted to Ashley that he had a gun, but he refused to show it to her.

Eric Roig testified that, during the summer before Crystal's death, he and Crystal went boating on Belleville Lake with their families. Petitioner held Crystal's head under water several times while they were "tubing." It did not appear to be normal horseplay to him. Petitioner also complained to him that Crystal got everything for which he (Petitioner) had to work. Occasionally, Petitioner would say, "One of these days I'm going to kill that bitch." Crystal sometimes expressed fear that Petitioner would beat her if she did certain things.

Dr. Carl Schmidt testified that Crystal died from a close-range gunshot wound to the head and that the manner of death was homicide. The bullet traveled downward from front to back, left to right, consistent with being shot from above.

The only defense witness was Petitioner's and Crystal's mother, Deborah Gordon Revelis. She testified that she was married to John Gordon, but had separated from him about a year before Crystal's death. During that year, she talked to Crystal almost every day and Crystal never expressed any fear of Petitioner, not even on the night of the shooting when they spent some time together. She stated that it was not unusual to see Crystal engaged in horseplay with Petitioner and that she had observed a few times when Petitioner held Crystal's head in the water and another time when Petitioner unsuccessfully attempted to throw Crystal down the stairs. Ms. Gordon Revelis also admitted that the police had to be called once when she (Ms. Gordon Revelis) and Petitioner were slapping each other. She never saw Petitioner in possession of a gun and she had no idea that he had a gun.

9

### III.  STANDARD OF REVIEW

Habeas petitioners are entitled to the writ of habeas corpus only if they can show that the state court's adjudication of their claims on the merits–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (Justice O'Connor's majority opinion on Part II).  A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."  *Id.* at 410 (emphasis in original).  "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."  *Id.* at 409.

> The state-court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them.  *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).  Instead, it is sufficient that the result and reasoning are consistent with Supreme Court precedent.  *Id.*  A state court moreover does not act contrary to clearly established law when the precedent of the

10

>Supreme Court is ambiguous or nonexistent; it may hold a view that is
>different from [the Sixth Circuit Court of Appeals] or another federal court.
>*See Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).  Ultimately,
>AEDPA's highly deferential standard requires that this court give the state-
>court decision "the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S.
>19, 24 (2002) (per curiam).

*Slagle v. Bagley*, 457 F.3d 501, 513-14 (6th Cir. 2006).

>Furthermore, state findings of fact are presumed to be correct unless the
>defendant can rebut the presumption by clear and convincing evidence.
>28 U.S.C. § 2254(e)(1).  Finally, review is conducted in light of the law as
>it existed at the time of the final state court decision, *Teague v. Lane,* 489
>U.S. 288 (1989), unless an intervening constitutional decision announces
>a "watershed" rule of criminal law with implications for the fundamental
>fairness of the trial proceeding.  *Caspari v. Bohlen,* 510 U.S. 383, 396 (1994).

*Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004), *cert. denied*, 544 U.S. 931 (2005).

## IV.  DISCUSSION

### A.  Hearsay and Other Acts Evidence

Petitioner alleges that his constitutional rights to due process and a fair trial were

violated by the prosecution's introduction of hearsay and uncharged criminal conduct.

### 1.  The Hearsay Evidence

The disputed hearsay consisted of:  (1) Matthew Owens' testimony that Crystal

Gordon said Petitioner and some of his friends had beaten her (Tr. May 9, 2001, at

153); (2) Ashley Ely's testimony that Crystal said Petitioner and his friends had beaten

her (Tr. May 10, 2001, at 9-14); and (3) Michael Pritchard's testimony that Crystal said

she was frightened of Petitioner (*Id.* at 109).  Petitioner contends that, contrary to the

prosecutor's arguments, the alleged hearsay was not admissible under exceptions to

the hearsay rule.

11

The alleged violation of the State's hearsay rule is not a basis for habeas relief, because "[a] federal court may not issue the writ [of habeas corpus] on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2241; *Rose v. Hodges*, 423 U.S. 19, 21 (1975) (per curiam)." *Estelle v. McGuire,* 502 U.S. 62, 68 (1991).

The Michigan Court of Appeals concluded that the hearsay was relevant because it suggested that the death was not accidental. The court of appeals held that the alleged hearsay regarding the victim's fear of Petitioner was admissible under the exception for existing state of mind. *See* Mich. R. Evid. 803(3). This court is bound by, and must defer to, the state court's interpretation of state law. *Bradshaw v. Richey*, 546 U.S. 74, 126 S. Ct. 602, 604 (2005); *Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir. 2005). This court also agrees with the state court's conclusion that, even if the evidence was improperly admitted, the error was harmless since "there was overwhelming admissible evidence that [Petitioner] was physically abusive toward the victim and struck her on numerous occasions." *Gordon*, Mich. Ct. App. No. 236355, at 5.

## 2. "Other Acts" Evidence

The "other acts" evidence consisted of: (1) Heather London's testimony that Petitioner fired a gun at road signs (Tr. May 9, 2001, at 12); (2) Rachel Johnson's testimony that Petitioner hit Crystal, slammed her down on the couch, called her vile names, and possessed a gun (*Id.* at 113-27); (3) Kevin Pritchard's testimony that Petitioner possessed a gun (*Id.* at 180); (4) Ashley Ely's testimony that Petitioner threw

12

Crystal on the ground, hit her, and said he was going to kill her (*Id*. at 200-01); (5) Eric Roig's testimony that Petitioner pushed Crystal's head under water, that Petitioner said he could secure an illegal weapon with the serial number scratched off, and that Petitioner threatened to kill both Crystal and a gang member who had a dispute with Roig (Tr. May 10, 2001, at 38-46); and (6) Michael Pritchard's testimony that Petitioner pointed a gun at Jason Russell (*Id*. at 107-125).  Petitioner alleges that any probative value in the evidence was exceeded by its prejudicial impact and that the evidence left the impression that he was a bad person.

The trial court held a two-day pretrial hearing on the prosecutor's motion to admit "other acts" evidence and granted the motion as to evidence of Petitioner's prior physical assaults and threats toward his sister.  At trial, the court frequently cautioned the jurors on the proper use of the evidence.  *See, e.g.,* Tr. May 9, 2001, at 10-11 (Heather London's testimony); *id. at* 117-18 and 144-45 (Rachel Johnson's testimony); *id*. at 181-82 (Kevin Pritchard's testimony); and Tr. May 10, 2001, at 116-17 and 130-32 (Michael Pritchard's testimony).  Both attorneys expressed satisfaction with the court's cautionary instruction on other acts evidence.  (Tr. May 9, 2001, at 6-7.)

The Michigan Court of Appeals determined that the trial court did not err by admitting the evidence under Michigan Rule of Evidence 404(b).  The court of appeals stated that evidence of Petitioner's prior physical assaults and threats toward the victim was probative of his intent and of a plan to harm the victim.  The court of appeals stated that evidence of Petitioner's familiarity and experience with handguns was probative of the absence of mistake or accident and that the evidence also assisted the jury in weighing the witnesses' credibility.

13

The state court's evidentiary ruling on a matter of state law is binding on this

court. *Richey*, 126 S. Ct. at 604. Petitioner's claim also has no merit because

> [t]here is no clearly established Supreme Court precedent which holds that
> a state violates due process by permitting propensity evidence in the form
> of other bad acts evidence. . . . While the Supreme Court has addressed
> whether prior acts testimony is permissible under the Federal Rules of
> Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997);
> *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly
> addressed the issue in constitutional terms.

*Bugh v. Mitchell*, 329 F.3d 496, 512-13 (6th Cir. 2003). Because there is no Supreme

Court decision holding that the admission of similar acts evidence violates the

Constitution, the state court's conclusion that Petitioner's claim did not warrant reversal

cannot be deemed "contrary to" Supreme Court precedent under 28 U.S.C. § 2254(d).

*Id.* at 513.

## B. Sufficiency of the Evidence

Petitioner alleges next that his rights under the Fifth and Fourteenth

Amendments to the United States Constitution were violated because there was

insufficient evidence to support his murder conviction. Petitioner contends that the case

was based on speculation and conjecture and that the prosecutor failed to prove the

requisite state of mind and that the shooting was not accidental. The Michigan Court of

Appeals adjudicated this claim on the merits and concluded that there was sufficient

evidence to enable a jury to infer all the necessary elements of second-degree murder.

### 1. Legal Framework

"[T]he Due Process Clause protects the accused against conviction except upon

proof beyond a reasonable doubt of every fact necessary to constitute the crime with

which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). After *Winship,* the

14

critical question on review of the sufficiency of the evidence to support a criminal

conviction is

> whether the record evidence could reasonably support a finding of guilt
> beyond a reasonable doubt.  [T]his inquiry does not require a court to 'ask
> itself whether *it* believes that the evidence at the trial established guilt
> beyond a reasonable doubt.'  Instead, the relevant question is whether,
> after viewing the evidence in the light most favorable to the prosecution,
> *any* rational trier of fact could have found the essential elements of the
> crime beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (internal citation and footnote omitted)

(emphasis in original).  This "standard must be applied with explicit reference to the

substantive elements of the criminal offense as defined by state law," *id.* at 324 n.16,

and through the framework of 28 U.S.C. § 2254(d), *Martin v. Mitchell*, 280 F.3d 594, 617

(6th Cir. 2002).

The Michigan Court of Appeals defined the elements of second-degree murder

as:

> "(1) a death, (2) caused by an act of the defendant, (3) with malice, and
> (4) without justification or excuse."  [*People v. Aldrich*, 246 Mich. App. 101,
> 123; 631 N.W.2d 67 (2001)].  Malice includes the intent to kill, the intent to
> do great bodily harm, or the intent to commit an act in wanton and wilful
> disregard of the likelihood that death or great bodily harm will occur.  *Id.*
> Malice can be inferred from the use of a deadly weapon.  *People v.
> Carines*, 460 Mich. 750, 760; 597 N.W.2d 130 (1991).

*Gordon*, Mich. Ct. App. No. 236355, at 5.

## 2.  The Facts

Evidence adduced at trial established that Petitioner did not like his sister, that he

had a motive for killing her, that he threatened to kill her, and that he was violent toward

her in the past. The testimony revealed that Petitioner was familiar with guns. Spent

bullets that matched the gun found in the backyard were discovered in Petitioner's

15

basement.  In addition, it appeared that someone had tried to cover up evidence of the shooting.  Petitioner initially told people that an intruder killed his sister.  His subsequent comment to his girlfriend that it was an accident, was an implicit admission that he was the shooter.  There was no evidence supporting the defense theory that the shooting was an accident, nor to support Petitioner's initial statement to police officers that an intruder had done it.  The gun found in the backyard did not malfunction once when fired thirty-three times by a police officer, who also claimed that a person would have to consciously switch off the safety device in order to discharge the gun.  (Tr. May 9, 2001, at 70, 85.)

A rational trier of fact easily could have concluded that Petitioner shot his sister and that he intended, at a minimum, to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior was to cause death or great bodily harm.  "[C]ircumstantial evidence alone is sufficient to sustain a conviction," and the prosecutor was not required to "'remove every reasonable hypothesis except that of guilt.'"  *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir. 1989) (quoting *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984)).  Moreover, this court is not required to reweigh the evidence or redetermine the credibility of the witnesses.  *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) (quoting *Marshall v. Lonberger*, 459 U.S. 422 (1983)).  "The mere existence of sufficient evidence to convict therefore defeats [the] petitioner's claim."  *Id.* at 788-89.  The state court's conclusion that the evidence was sufficient to sustain Petitioner's murder conviction did not result in an unreasonable application of *Jackson*.

## C.  The Prosecutor

16

The third habeas claim alleges that the prosecutor violated Petitioner's rights to a fair trial and due process by (1) failing to correct false testimony, (2) failing to give notice of certain "other acts" evidence,[1] (3) withholding evidence, and (4) commenting on Petitioner's silence at trial and shifting the burden of proof.  Petitioner raised this issue in a motion for new trial, which the trial court denied.  The Michigan Court of Appeals ruled that the trial court did not abuse its discretion by denying the motion.

### 1.  Legal Framework

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review."  *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004), *cert.* denied, 544 U.S. 921 (2005).  To prevail on a claim of prosecutorial misconduct, a petitioner must demonstrate that the prosecutor's remarks, taken in the context of the entire trial, were sufficiently prejudicial and infected the trial with such unfairness as to make the resulting conviction a denial of due process.  *Donnelly v. DeChristoforo*, 416 U.S. 637, 639, 643 (1974).  It is not enough to show that the prosecutor's conduct or remarks were undesirable or even universally condemned.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  "On habeas review, the standard to be applied to claims of prosecutorial

---

[1] Petitioner, calls this "bad acts" evidence, and many others refer to it as "prior bad acts." In fact, the Rule permitting the introduction of such evidence, MRE 404(b), contemplates *other* acts, and does not limit evidence of them to acts that are either "bad" or "prior" in time to the event in question. Specifically, the Rule provides:
> Evidence of *other crimes, wrongs, or acts* is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

MRE 404(b) (emphasis added).

17

misconduct is whether the conduct was 'so egregious as to render the entire trial fundamentally unfair.'"  *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (quoting *Cook v. Bordenkircher*, 602 F.2d 117, 119 (6th Cir. 1979)).

 "[S]tate courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'"  *Slagle*, 457 F.3d at 516 (alteration in original) (quoting *Donnelly*, 416 U.S. at 645).  Moreover,

> [i]n determining whether prosecutorial misconduct mandates habeas relief, [courts] apply the harmless error standard.  *Pritchett v. Pitcher,* 117 F.3d 959, 964 (6th Cir. 1997).  An error is found to be harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson,* 507 U.S. 619, 638 (1993).

*Bates v. Bell*, 402 F.3d 635, 641 (6th Cir.), *cert. denied*, __ U.S. __, 126 S. Ct. 163 (2005).

## 2.  Uncorrected False Testimony

Petitioner alleges that the gun used in the shooting was stolen on August 6, 2000.  He faults the prosecutor for not correcting testimony that witnesses saw Petitioner with the gun several weeks and even months before the August 15 shooting.

Prosecutors may not deliberately deceive a court and jurors by presenting false evidence; nor may they allow false evidence to go uncorrected.  *Giglio v. United States*, 405 U.S. 150, 153 (1972).  However, "[t]o prevail on a false-testimony claim, [a habeas petitioner] must show (1) that the prosecution presented false testimony, (2) that the prosecution knew was false, and (3) that was material."  *Abdus-Samad v. Bell*, 420 F.3d 614, 625-26 (6th Cir. 2005), *cert. denied*, __ U.S. __, 127 S. Ct. 380 (2006).  The statements in question must be "indisputably false" rather than "merely misleading."

18

*Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000).  "The burden is on the defendant[] to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony."  *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989) (citing *United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987)).

The witnesses who said that they saw Petitioner with a gun were unable to say precisely when they saw Petitioner with a gun.  Kevin Pritchard testified that he saw Petitioner with a gun a week or two before the shooting (Tr. May 9, 2001, at 178).  Michael Pritchard described the same incident and said that it occurred "a couple of weeks" before the shooting.  (Tr. May 10, 2001, at 112.)  Ashley Peters testified that, two or three weeks before the shooting, she saw Petitioner fire a gun in the basement of his home.  (Tr. May 8, 2001, at 81.)  The witnesses were only estimating the date on which they saw Petitioner with a gun.

Furthermore, the gun that the witnesses claimed to see Petitioner handling could have been a different gun from the one thought to be used in the shooting.  The gun found in the backyard was black, but one witness stated that she saw Petitioner in possession of a silver gun.  Petitioner has failed to show that the witnesses' testimony concerning Petitioner's possession of a gun was false and that the prosecutor knew it was false.

### 3.  Failure to Give Notice

Petitioner alleges that the prosecutor failed to give notice of particular "other acts" evidence.  The evidence in question was elicited during the prosecutor's cross-examination of Petitioner's mother.  Ms. Gordon Revelis testified that she and Petitioner

19

had an altercation in a counselor's office and that the police had to be called.  (Tr. May 10, 2001, at 216-20.)

The contention that the prosecutor failed to provide proper notice of this evidence alleges a violation of state evidentiary law.  A federal habeas court may not grant "collateral relief unless [it] 'find[s] that the prosecutor's [conduct] constituted more than simply trial error under state law."  *Wilson v. Mitchell*, 250 F.3d 388, 399 (6th Cir. 2001).

Moreover, the trial court permitted the prosecutor to pursue the line of questioning to which Petitioner objects, despite defense counsel's objection at trial. Finally, as the Michigan Court of Appeals recognized, defense counsel invited the error by eliciting testimony on direct examination that there was never a problem with her children during the year before she moved out of the home.  (Tr. May 10, 2001, at 199-200.)  The court concludes that the prosecutor's conduct was not improper.

### 4.  Withheld Information

Petitioner alleges that the prosecutor withheld Crystal Gordon's school counseling records.  He claims that, to date, he does not know whether there is exculpatory evidence in the records, which would make Crystal's comments to witnesses less reliable.

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  "There are three components of a true *Brady* violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by

20

the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 427 U.S. 263, 281-82 (1999).

Even assuming that the prosecutor withheld evidence, Petitioner merely speculates that there is exculpatory evidence in his sister's counseling records. He has failed to satisfy an essential element of a *Brady* claim: that the evidence withheld from him was favorable to the defense.

### 5.  Closing Arguments

Petitioner's final allegation about the prosecutor is that she commented on his silence at trial, shifted the burden of proof, vouched for her own arguments and disparaged the defense during closing arguments. When reviewing claims of prosecutorial misconduct, courts must first ask whether the prosecutor's conduct or remarks were improper. *Slagle,* 457 F.3d at 516. If the conduct or remarks were improper, the court must consider whether the improper acts were so flagrant as to warrant reversal. *Id.* The four factors to consider when analyzing conduct for flagrancy are: "(1) whether the evidence against the defendant was strong; (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally." *Id.*

### a. Comments on the Lack of Evidence
### Supporting an Accidental Shooting

The prosecutor began her closing argument by stating:

> As I prepared my closing argument this weekend, I kept struggling with the concept of what the defendant told his girlfriend on the phone, that it was an accident.

        Ask yourself, what else would he tell her?  What else would he tell
his girlfriend only days after the murder besides it was an accident?   But
does he tell anybody who really matters in the grand scheme of things that
it was an accident?  No.

(Tr. May 14, 2001, at 10-11.)  In her rebuttal argument, the prosecutor asked

hypothetically whether the jurors had heard anyone testify that the gun was unloaded or

that Petitioner thought the gun was unloaded.  She answered her own question by

saying, " No." (*Id.* at 57.)  Petitioner claims that these comments shifted the burden of

proof to him and constituted an improper reference to his silence at trial.

        Prosecutors may not comment on a defendant's failure to testify at trial, *Griffin v.*

*California*, 380 U.S. 609, 615 (1965), nor "suggest that the defendant had the burden of

proof or any obligation to produce evidence to prove his innocence."  *United States v.*

*Clark*, 982 F.2d 965, 968-69 (6th Cir. 1993).  Prosecutors are entitled to "argue the

record, highlight the inconsistencies or inadequacies of the defense, and forcefully

assert reasonable inferences from the evidence."  *Bates*, 402 F.3d at 646.  They are

"free to argue," for example, "that the jury should arrive at a particular conclusion based

on the record evidence, including the conclusion that the evidence proves the

defendant's guilt."  *Caldwell v. Russell*, 181 F.3d 731, 737 (6th Cir. 1999), *abrogated on*

*other grounds as explained in Mackey v. Dutton*, 217 F.3d 399, 406 (6th Cir. 2000).

        The court views the disputed remarks in this case as a reflection on the trial

testimony, as opposed to a reference to Petitioner's failure to take the stand.  The

prosecutor was entitled to "'summarize the evidence and comment on its quantitative

and qualitative significance.'"  *Byrd*, 209 F.3d at 534 n.41 (quoting *United States v.*

*Bond*, 22 F.3d 662, 669 (6th Cir. 1994)).  She also was permitted to point out the lack of

evidence supporting the defense theory, *United States v. Forrest*, 402 F.3d 678, 686 (6th Cir. 2005), and to comment on the lack of exculpatory evidence.  *United States v. Peck*, 62 Fed. Appx. 561, 569 (6th Cir. 2003) (unpublished); *United States v. Tarwater*, 308 F.3d 494, 511 (6th Cir. 2002).  The challenged remarks were proper because they were not an implicit reference to Petitioner's failure to testify.  Even if improper, the comments were not flagrant in light of the substantial evidence of Petitioner's guilt and the fact that the jurors promised to honor the trial court's instruction that the attorneys' arguments were not evidence.  (*Id.* at 9 and 69.)

### b.  Vouching

Petitioner alleges that the prosecutor vouched for her own arguments and ideas by referring to her ten years of experience.  The remark was a fleeting one, which merely provided a context for the prosecutor's comment about the different defenses that she had heard during her career.  (Tr. May 14, at 55.)  Even if the remark was improper, it could not have had a significant impact on the jury's verdict.

### c.  Disparaging the Defense

Petitioner contends that the prosecutor disparaged the defense in her rebuttal argument by referring to defenses such as the "twinkie defense," the "I was an abused child" defense, and the "I wasn't feeling right" defense.  The prosecution described defense counsel's closing argument and defense as "blame all the kids who didn't tell anybody about the gun."  The prosecutor quoted the defense as saying, "If one of these kids had come forward, this accident wouldn't have happened."  *Id.*

Although prosecutors may not "make unfounded and inflammatory attacks on the opposing advocate," *United States v. Young*, 470 U.S. 1, 9 (1985), they are "permitted

23

to comment on the defense's trial strategy." *Slagle*, 457 F.3d at 522 (citing *Byrd*, 209 F.3d at 535).  They ordinarily are "entitled to wide latitude in rebuttal argument and may fairly respond to arguments made by defense counsel." *Angel v. Overberg*, 682 F.2d 605, 607-08 (6th Cir. 1982) (*en banc*).

Here, the prosecutor was commenting on the inadequacy of the defense.  The remarks were not a "personal, unsubstantiated attack[] on the character and ethics of opposing counsel." *United States v. Holmes*, 413 F.3d 770, 775 (8th Cir. 2005).  The court therefore concludes that the prosecutor's comments were not improper.

### d.  Summary

The Sixth Circuit "has been reluctant to grant habeas petitions based on improper prosecutorial statements at closing argument." *Wilson*, 250 F.3d at 399.  "The misconduct must be 'so fundamentally unfair as to deny [the defendant] due process.'" *Id.* (quoting *Kincade v. Sparkman*, 175 F.3d 444, 445-46 (6th Cir. 1999)).  The disputed remarks in this case, no doubt, were deliberately made.  However, it is unlikely that the prosecutor's remarks misled the jury or prejudiced Petitioner, given the strength of the evidence against Petitioner and the lack of evidence indicating an accidental shooting. The court concludes that the remarks, even if improper, were not so fundamentally unfair or flagrant as to warrant reversal of the conviction.

### D.  The Right to Confront Witnesses

Petitioner asserts that the trial court violated his Sixth Amendment right to confront witnesses by limiting his attorney's cross examination of Corporal Kenneth Voigt, who was a key investigator for the State.  The United States Court of Appeals for the Sixth Circuit recently explained that

24

[t]he Confrontation Clause of the Sixth Amendment bestows upon the criminal defendant the right to confront the witnesses against him, and the opportunity to cross-examine such witnesses: "Indeed, [t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986) (alteration in the original) (internal quotation marks and citation omitted). That said, the criminal defendant's right to cross-examine witnesses is not limitless:

> [T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And, as we observed earlier this Term, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."

*Id.* at 679 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam)). Thus, a state trial court has discretion to limit cross-examination. Moreover, "[w]here it is merely the *extent* of cross-examination that is limited, the trial judge retains a much wider latitude of discretion." *Dorsey v. Parke*, 872 F.2d 163, 167 (6th Cir. 1989).

> Where the trial court limits the extent of cross-examination, the inquiry for the reviewing court is "whether the jury had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory." *Id.*

*Stewart v. Wolfenbarger*, 468 F.3d 338, 347 (6th Cir. 2006). "[T]he bounds of the trial court's discretion are exceeded when the defense is not allowed to 'plac[e] before the jury *facts* from which bias, prejudice or lack of credibility of a prosecution witness might be inferred[.]'" *Dorsey,* 872 F.2d at 167 (quoting *United States v. Garrett*, 542 F.2d 23 (6th Cir. 1976)).

Petitioner's claim arose on cross-examination of Corporal Kenneth Voigt. When defense counsel asked Corporal Voigt whether he felt political pressure to "wrap up" the

25

case, the prosecutor objected on the basis of relevance, and the trial court sustained

the objection.  (Tr. May 10, 2001, at 187.)  Petitioner alleges that he was trying to show

that many things were overlooked, such as sending bed sheets that covered a bullet

hole in the wall to the lab to determine whether there was a bullet hole in them.

Corporal Voigt, however, testified that he thoroughly checked the sheets and that there

was no hole in them.  (*Id.* at 179-80.)

Petitioner also alleges that half of all the photographs taken by the police at the

crime scene were "conveniently" destroyed.  The officers testified only that they had

used an old camera and that the camera or the film malfunctioned and the photographs

were ruined accidentally.  (*Id.* at 190; Tr. May 8, 2001, at 31-32.)

 Even if Petitioner had been able to show that Corporal Voigt felt pressured to

conclude his investigation, Voigt did not express any bias toward Petitioner, and

Petitioner has not demonstrated that a more thorough investigation would have helped

him.  Petitioner was permitted to question Corporal Voigt on other matters related to the

case, and the jury had enough information, despite the limits placed on defense

counsel, to assess the defense theory that Petitioner accidentally shot his sister.

Petitioner's right of confrontation was not violated.

### E.  Cumulative Effect of Errors

The fifth and final claim alleges that Petitioner's constitutional right to a fair trial

and his right to due process of law were violated by the cumulative effect of the

constitutional errors at trial.  "The Supreme Court has not held that distinct constitutional

claims can be cumulated to grant habeas relief."  *Lorraine v. Coyle*, 291 F.3d 416, 447

(6th Cir. 2002).  Therefore, constitutional errors that would not individually support

26

habeas relief cannot be cumulated to support habeas relief.  *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005), *cert. denied sub nom Moore v. Simpson*, __ U.S. __, 127 S. Ct. 557 (2006).   Petitioner is not entitled to habeas relief on the ground that the alleged errors at trial, when combined, require reversal of his convictions.

## V.  CONCLUSION

The state appellate court's conclusions was not based upon a mistaken understanding of the facts of the case, and was neither contrary to, nor an unreasonable application of, Supreme Court precedent.  Accordingly,

IT IS ORDERED that Petitioner's habeas corpus petition [Dkt. # 1] is DENIED.

 S/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  March 9, 2007

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, March 9, 2007, by electronic and/or ordinary mail.

 S/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522